**FORDICE CONSTRUCTION COMPANY and Four F Corporation, Intervenor–Plaintiffs,**

v.

**John MARSH, Secretary of the Army of the United States; Samuel P. Collins, Jr., Colonel, Corps of Engineers, U.S. Army; and the United States Army Corps of Engineers; Michael Cardenas, Administrator, Small Business Administration; and the United States Small Business Administration, Defendants.**

**Civ. A. No. W81–0028(W).**

United States District Court, S.D. Mississippi, W.D.

March 14, 1990.

---

Lee Davis Thames and Luther T. Munford, Jackson, Miss., for intervenor-plaintiffs.

Daniel E. Lynn, Asst. U.S. Atty., Jackson, Miss., Helen M. Golberg, U.S. Small Business Admin., John M. Gadzichowski, Roger A. Calaizzi, and Martin G. Hacala, U.S. Dept. of Justice, Civ. Rights Div., Employment Litigation Section, Washington, D.C., for defendants.

Thomas E. Chandler and David K. Flynn, U.S. Dept. of Justice, Washington, D.C., for defendants on appeal.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Tried to the court without a jury on an earlier day, this case presents the question of whether the assignment of eleven contracts by the Army Corps of Engineers (Corps) to the Small Business Association (SBA) in fiscal year 1981 for minority enterprise consideration in accordance with 15 U.S.C. § 637(a)(1)(C) violated the rights of the plaintiffs under 42 U.S.C. § 2000d which bars racial discrimination in government program participation.[1] The plaintiffs are non-minority competing contractors in the Vicksburg, Mississippi, market who rely upon small-business contracts let through the SBA. The eleven contracts in question represent 100% of the small-business contracts to be let in the Vicksburg, Mississippi, area for fiscal year 1981. The plaintiffs were precluded from bidding on any of the eleven contracts because said contracts were assigned only for minority contractor bidding under what is commonly known as the SBA § 8(a) program. This court is asked to declare that this 100% assignment discriminated against the plaintiffs and constituted arbitrary federal agency action, relief from which may be sought in the form of a non-monetary injunctive or mandatory decree in accordance with 5 U.S.C. § 702. Pursuant to Rule 52, Federal Rules of Civil Procedure, the court now announces its findings of fact and conclusions of law.

---

1. The SBA § 8(a) program is codified at 15 U.S.C. § 637 which provides at § 637(a)(1)(C) that it shall be the duty of the Administration (SBA) and it is empowered whenever it determines such action is necessary or appropriate, "to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns for construction work, services or manufacture, supply, assembly of such articles, equipment, supplies, materials, or parts thereof, or servicing or processing in connection therewith, or such management services as may be necessary to enable the Administration (SBA) to perform such contracts."

Title 42 U.S.C. § 2000d provides:
No person in the United States shall, on grounds of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

## JURISDICTION

Bringing this action pursuant to 42 U.S.C. §§ 1981 and 2000d, the plaintiffs also claim denial of due process and equal protection under the Fifth and Fourteenth Amendments of the Constitution of the United States. Declaratory relief is sought in accordance with 5 U.S.C. § 701 et seq., and 28 U.S.C. §§ 2201 and 2202. Because a federal question is presented, the plaintiffs assert jurisdiction in accordance with 28 U.S.C. § 1331. Original jurisdiction of a civil rights claim is also asserted under 28 U.S.C. § 1343. Jurisdiction is also said to be based upon 28 U.S.C. §§ 1346 and 1361, since the action is one against agencies of the United States which seeks to compel officers of the United States to perform duties owed the plaintiffs.

## THE SBA § 8(a) PROGRAM

The federal government generally contracts for its services and property pursuant to general procurement, protective procurement, or negotiated contracts. In protective procurement only those persons who are members of a class of persons designated by Congress to receive federal assistance and protection are invited to submit bids. The SBA is the federal agency created to assist small-business concerns in securing contracts with the federal government. *See, Jets Services, Inc. v. Hoffman,* 420 F.Supp. 1300, 1303 (M.D.Fla. 1976). Where a federal agency commits some of its contracts to SBA for bids to be taken only from SBA certified small-business concerns, a "small-business set-aside" is created. The term "set-aside" means that the contract has literally been set aside for small-business bidding only, *Id.* at

page 1303, and, thus, falls into the protective procurement category.

The 8(a) program is established as part of the Small Business Act which is codified at 15 U.S.C. § 637(a). In order to further the policy of encouraging minority business enterprises, Congress authorized the SBA to act as an intermediary between the Government and minority businesses and to contract with governmental agencies such as the Corps. The SBA then "arranges for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns." See, 15 U.S.C. § 637(a)(1)(C).[2] Hence, socially and economically disadvantaged small-business concerns are then a sub-set within the class of protective procurement contractors, entitled to their own special consideration. Because of the strong policies inherent in the § 8(a) program, contracts may be awarded without competition and at rates higher than those at which a non-§ 8(a) business could perform. *In Re Exquisito Services, Inc.,* 823 F.2d 151, 154 (5th Cir.1987).

SBA's role under § 637(a)(1)(C) is to contract for services and to train minority small-business concerns by having them perform the services, thereby enabling them to gain valuable experience and eventually to become independently competitive. *See, In Re Exquisito Services, Inc., supra,* at p. 154. However, this is not SBA's exclusive role under the Act. The statute makes clear that SBA's responsibility extends to both minority and non-minority small-business concerns to see that both have the maximum practicable opportunity

**2.** Title 15 U.S.C. § 637(a)(4)(A)(i) provides that for the purposes of this section, the term "socially and economically disadvantaged small business concern" means any small business concern which meets the requirements of subparagraph (B) and which is at least 51% owned by (I) one or more socially and economically disadvantaged individuals, (II) and economically disadvantaged Indian Tribe, or (III) and economically disadvantaged Native Hawaiian organization;

Section 637(a)(5) defines socially disadvantaged individuals as, "those who have been subjected to racial or ethnic prejudice or cultural

bias because of their identity as a member of a group without regard to their individual qualities."

Section 637(a)(6) defines economically disadvantaged individuals as, "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital credit opportunities as compared to others in the same business area who are not socially disadvantaged. In determining the degree of diminished capital and credit opportunities the Administration (SBA) shall consider, but not be limited to, the assets and net worth of such socially disadvantaged individual."

to participate in government contracts. A fair reading of applicable portions of the Act suggests that neither minority nor non-minority small-business concerns should be awarded contracts to the exclusion of the other.[3]

Other pertinent aspects of the § 8(a) program are that the SBA shall develop and implement an outreach program to inform and recruit eligible small-business concerns. 15 U.S.C. § 637(a)(10). To the maximum extent practicable, awards of contracts shall be to contractors within the county or state where the work is to be performed. 15 U.S.C. § 637(a)(11). No small-business concern shall be deemed eligible for any assistance pursuant to this subsection unless the SBA determines that with contract, financial, technical and management support the small business concern will be able to perform contracts which may be awarded to such concern under paragraph (1)(C) and has reasonable prospects for success in competing in the private sector. 15 U.S.C. § 637(a)(7). This last consideration, the "reasonable prospects for success in competing in the private sector," has been referred to in this litigation as "graduation." The purpose of the § 8(a) program is to train, then release the eligible participant to the open competitive market, although the successful participant may continue to be eligible for small-business set-asides of the non-§ 8(a) variety after "graduation" from the program.

### THE CORPS–SBA INTERFACE PURSUANT TO § 8(a)

As previously stated, the SBA is empowered by 15 U.S.C. § 637(a) to act as an intermediary between a federal agency, in this case the Corps, and eligible protective procurement contractors. SBA may solicit Corps contracts through the Corps Small and Disadvantaged Business Utilization Officer, also referred to as the SADBU. If the SBA has not solicited the Corps for contracts, the SADBU may take the initiative. Once the Corps has undertaken to create a set-aside with some of its contracts, it has a duty to evaluate the set-aside in accordance with 32 C.F.R. § 1–705.5.[4] One of the regulatory requirements is to conduct an impact study to determine the effect of a set-aside on the proposed area. According to the SADBU for the Corps, a 10% set-aside was considered minimal, hence an impact study would not be absolutely necessary when only a 10% set-aside was contemplated. Properly initiated and carried out, a set-aside effort would begin with a list of eligible contractors provided by the SBA. The Corps would then evaluate the § 8(a) eligible contractors in juxtaposition to non–§ 8(a) eligible contractors in order to determine the size or percentage of its proposed set-aside. This did not occur in the case *sub judice*. As this opinion shall demonstrate, the Corps conducted no impact study. Instead, in order to improve the § 8(a) showing in the area, all contracts available for small-business set-aside were assigned for exclusive § 8(a) consideration.

### STATEMENT OF THE CASE

The case involves a joint claim for declaratory judgment sought by the intervenor-plaintiffs, Fordice Construction Company and Four F Corporation (hereinafter plaintiffs), pertaining to the assignment of the aforesaid eleven contracts by the United States Army Corps of Engineers (Corps) to the Small Business Administration (SBA) in

---

**3.** The § 8(a) program was established, "to aid, counsel and protect ... the interests of small-business concerns in order to preserve free competitive enterprise [and] to insure a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government ... be placed with small-business enterprises ...

It is the policy of the United States that small-business concerns, and small-business concerns owned and controlled by socially and economically disadvantaged individuals, shall have max-imum practicable opportunity to participate in the performance of contracts let by any Federal agency ..." 15 U.S.C. §§ 637(a) and 637(d)(1).

**4.** The seven factors to be considered are listed at footnote one of the *Valley Construction Company v. Marsh,* 714 F.2d 26, (5th Cir.1983) opinion, 714 F.2d at page 27. It is 1–705.5(c)(1)(B)(vi) which requires the Corps to conduct impact studies where contracts have historically been let by small business or surplus labor set-asides.

accordance with the Small Business Act § 8(a), 15 U.S.C. § 637(a)(1)(C). Because all eleven contracts available for small-business set-asides to be let by the Corps in the Vicksburg area in 1981 were set-aside for § 8(a), three local non-minority contractors, including the above named plaintiffs, who were eligible for small business set-aside contracts, but not for § 8(a) set-aside contracts, brought this action pursuant to 42 U.S.C. §§ 1981 and 2000d, and 5 U.S.C. § 551 et seq., seeking to enjoin the 100% set-aside to the SBA under § 8(a). A temporary restraining order was granted by this court, Honorable Judge Dan Russell presiding. While the order was in effect, the parties obtained permission from the court for the Corps to dispose of the eleven contracts. Six were not funded and were therefore not awarded. Of the five remaining contracts, two were submitted for the SBA's § 8(a) program while three others were let under competitive bidding. Four F Corporation, one of the plaintiffs in this cause, received two of the three contracts. The district court thereafter dismissed the case as moot since all eleven contracts had been disposed of, and there was no more case and controversy. The plaintiffs appealed the dismissal to the United States Court of Appeals for the Fifth Circuit, and the dismissal of the plaintiffs' claim for injunctive relief was affirmed. The Fifth Circuit held that the Small Business Act, 15 U.S.C. § 634(b)(1), precluded injunctive relief against the SBA. However, the plaintiffs' complaint included a prayer for declaratory relief. The Fifth Circuit found that the mootness doctrine was circumvented where an act was capable of repetition, yet evaded review. The case was remanded for declaratory judgment on the merits of the plaintiffs' claim that the Corps and SBA ignored to the plaintiffs' detriment their respective statutory and regulatory duties to consider the effect a 100% minority enterprise set-aside would have on competing non-minority contractors. *See, Valley Construction Company v. Marsh*, 714 F.2d 26 (5th Cir.1983).

## THE PLAINTIFFS' ALLEGATIONS

The plaintiffs do not challenge the constitutionality of the SBA's § 8(a) program. The constitutionality of the program was upheld by the Fifth Circuit in the case of *Ray Baille Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696 (5th Cir.1973). Instead they assert that a 100% set-aside of all contracts to be let in the Vicksburg, Mississippi, area by the Corps through the SBA was an abuse of the program, unsupported by the governing regulations, and damaging to the plaintiffs who, as non-minority contractors, were precluded from bidding on any of the eleven contracts to be let in 1981. This preclusion is said to violate 42 U.S.C. § 2000d. The Corps and the SBA are said to be equally responsible for the chain of events leading up to the decision to set-aside all eleven contracts for minority enterprise assignment.

### A. Allegations Against the Army

The Corps is said to have been pressured into taking rapid action with regard to the § 8(a) program by the Secretary of the Army, Clifford Alexander. Supposedly, according to the plaintiffs, this pressure caused the Army defendants to ignore the regulatory requirement to evaluate the impact of a minority enterprise set-aside and instead to move hastily toward compliance with § 8(a) goals. Secretary Alexander sent a letter dated June 4, 1979, to all major continental United States commands (CONUS) stating that the President of the United States expected the Federal Government to triple the value of direct § 8(a) and indirect subcontracting awards to minority firms between the 1977 and 1979 fiscal years. According to the plaintiffs, the entire army was given notice by this letter that increased participation in the SBA's § 8(a) program was imperative. A second letter relied upon by the plaintiffs from Secretary Alexander to Lieutenant General J.W. Morris, then the Chief of Engineers for the Department of the Army, dated December 11, 1979, states that the Corps of Engineers reported shortfalls in § 8(a) program participation for the 1979 fiscal year. Secretary Alexander expressed his disap-

pointment personally.[5] The plaintiffs assert that military careers were hanging on this single issue since those who performed well in the § 8(a) program were commended, while those who did not stood in danger of the Secretary's critical scrutiny. The plaintiffs submit a letter dated January 22, 1980, from General John R. Guthrie, commander of the Army Materiel Development and Readiness Command (DARCOM), to Clifford Alexander, thanking the Secretary for his letter of appreciation for DARCOM's accomplishments in support of the § 8(a) program. In another letter relied upon by the plaintiffs from Secretary Alexander to the President of the United States dated January 28, 1980, Secretary Alexander assures the President that the § 8(a) program was the key to meeting the goals set in support of minority business.[6]

The plaintiffs assert that the pressure to show improved participation performance in the § 8(a) program became more intense in 1980. Secretary Alexander denied in deposition testimony that any standard goals were set with regard to § 8(a) participation, or that any penalties were imposed for failure to meet goals. However, he acknowledged that commanders were expected to meet "dollar goals" and that those commanders failing to do so were sent letters reminding them of that failure. The plaintiffs refer to the Secretary's action as continuing pressure on the various CONUS commanders to increase their § 8(a) performance. They refer to the Secretary's general letter[7] to all commands dated April 21, 1980, wherein the Secretary outlines the § 8(a) goals set by the Department of Defense. At the bottom of this letter is Secretary Alexander's personal note which states that, "I expect you to meet our new goals. Your dedication to this effort is important."

In its rush to comply with these new goals, the Army is said to have neglected to consider impact on competing non-minority businesses as required by 32 C.F.R. § 1–705.5. Secretary Alexander stated that he relied upon the advice of his SADBU, one Juanita P. Watts, for guidance in this area. In her deposition Watts stated that the Secretary relied upon her to set the monetary goals. However, the way in which those goals were passed on to the various CONUS commands was purely a command function within the Army. She stated that there was no consideration of impact upon non-minority businesses in any area where a § 8(a) set aside might be implemented in a manner to increase the § 8(a) showing, at least not at her level of the total scheme of operations.

The Chief of SADBU for the Army Corps of Engineers in 1980 was Eugene Blalock who stated that he set goals by looking to a particular command's average activity for past years, calculating 10% of that average activity, then setting that amount as the § 8(a) goal for each command. No consideration was given to possible impact on competing non-minority businesses.

Colonel Sam P. Collins was the Vicksburg District commander at the time in question. In a divisional memorandum dated August 6, 1980, he referred to a district engineers meeting of the Lower Mississippi Valley Division which he attended on July 17, 1980. Participation in the § 8(a) program was discussed "in some detail." Collins indicated that he had met with his SADBU, John Hatcher, to discuss the challenges faced and how they could be

---

5. The last paragraph of the letter stated:
   In view of the Corps of Engineers performance and the reporting shortfalls in FY 1979, it is essential that you become personally concerned with providing a more positive direction for these programs. I anticipate that the FY 1980 goals will require greater effort throughout the Department of the Army and each major command must do its part to see that it meets its goals.
   Below his signature Alexander wrote, "Jack— This is a dismal showing. I expect improvement immediately!"

6. Alexander informs the President that, "I have given recognition to those army commanders and operating personnel who support these [§ 8(a)] programs and I have also taken other actions to stimulate more positive participation by those whose performance has not been good." Exhibit P–36.

7. Exhibit P–48.

met. In an attached document titled "Actions Within the Capability of the District to Remedy," Hatcher set forth a list of suggestions for improving participation.[8] His list of responses includes the suggestion that more contracts be offered to SBA for § 8(a) consideration.

John Hatcher, SADBU for the Corps in the Vicksburg, and author of the aforesaid list of suggestions, was the individual who first recommended a 100% set-aside of the Corps' eleven available small-business contracts in 1981, even though he personally thought a 10% set-aside was more reasonable. Hatcher states that he made this suggestion because of the emphasis being placed upon the § 8(a) program throughout the Army. Moreover, he admits that he did not consider the availability of § 8(a) qualified contractors when he made the suggestion. Hatcher saw eligibility as a function of SBA, so he gave the matter no thought. Because he did not know who might be eligible, Hatcher concluded that everything should be offered so that § 8(a) eligible contractors could be identified from the response. He also believed that a 100% set-aside would allay any criticism by those seeking a marked improvement in § 8(a) participation.

Hatcher, Major James E. Brown, and one Arthur Lagg all stated that it was not their true intention to offer every contract to SBA for § 8(a) participation alone. However, the SADBU advisory counsel developed a plan of operation which provided in paragraph three that the Corps should, "Offer everything to SBA."[9] Neither Hatcher nor Brown could deny that all eleven small-business solicitations were committed to SBA pursuant to 15 U.S.C. § 637(a)(1)(C).[10]

The plaintiffs contend that the Corps should have waited for the SBA to provide its list of § 8(a) eligible contractors for 1981 before issuing solicitations for that year. This would have been in accordance with 15 U.S.C. § 637(a)(10) and 32 C.F.R.

§ 1–705.5. This statue and the regulation provide that SBA will screen potential contractors and send the Army or other federal agency a list of approved vendors. It is then, after the list has been presented, that the SBA presents a request for commitment of contracts available. *See, Valley Construction Company v. Marsh, supra,* at page 27.

As the matter was conducted, the Corps took into consideration no guidelines or criteria for determining what its contract commitment to the § 8(a) program should be. The factors the Corps should have considered are set forth in 32 C.F.R. § 1–705.5, especially 1–705.5(c)(1)(B)(vi) which provides that consideration is to be given to impact where items such as these contracts have been acquired historically by small business or labor surplus set-aside. No impact studies were conducted at any level along the chain of command. No witness before this court expressed a contemporaneous awareness of the federal regulation or what it required. The plaintiffs assert that 100% of all the available contracts being relegated to § 8(a) caused them to suffer great detriment, especially when both relied almost wholly upon small business set-asides for their business existence. This detriment could have been avoided, according to the plaintiffs, if the regulatory scheme had been followed, and those responsible had not been so concerned with § 8(a) goal compliance. Further, continue the plaintiffs, compliance with the regulation, properly carried out, would have revealed the lack of local Vicksburg area § 8(a) eligible contractors, and would have verified the plaintiffs' assertions that such a set-aside would leave non-minority small-business concerns with nothing. Hence, conclude the plaintiffs, the foundation for the creation of a 100% § 8(a) set-aside could and would not have materialized.

### B. The Allegations Against SBA

The plaintiffs also criticize the SBA's role in all of this. The plaintiffs charge

---

**8.** This document is attached to Collins' letter marked Exhibit P–81.

**9.** Exhibit P–159.

**10.** Exhibit P–155, which indicates that no solicitations for 1981 other than § 8(a) were being issued.

that SBA failed to protect the interests of both minority and non-minority small-business concerns in its neglect to screen potential contractors as it was supposed to do in order to determine § 8(a) program eligibility. Furthermore, according to the plaintiffs, not all contractors selected by SBA were § 8(a) eligible. Plaintiffs assert that the program was subject to abuse which was either undetected or ignored by SBA personnel, and that no study was made in the Vicksburg area to determine if any § 8(a) certifiable contractors existed, contrary to the statutory directive that to the maximum extent possible contracts were to be let in the county or state where the work contracted was to be performed. 15 U.S.C. § 637(a)(11). The SBA is said to have resorted to a list of regular § 8(a) contractors, some of whom were not eligible, and some of whom were no longer socially and economically disadvantaged, and to have supported their continued participation in the § 8(a) program. Further, SBA is also said to have ignored its own standard operating procedures by considering eligible contractors for projects far in excess of the dollar goals established in their respective SBA business plans.

The plaintiffs rely upon the testimony of Isaiah Washington, the assistant regional manager for the SBA office in Atlanta, Georgia, who stated that SBA was charged with the responsibility to provide federal agencies such as the Corps with lists of § 8(a) eligible contractors. The process of determining who was eligible was said to be carried out by SBA employees designated as Business Development Specialists. These persons interview prospective candidates, determine their eligibility, monitor their progress in the program, and determine when a successful candidate in the program is to be "graduated" to the ranks of non–§ 8(a) subsidized contractors.

Washington noted that SBA was divided nationwide into several regions of responsibility.[11] There are several regional offices that perform the same services with regard to the § 8(a) program. It was SBA policy that in the event one region had no § 8(a) eligible contractor, another region could take on the committed contract for development. The plaintiffs contend that this process could have taken the available contracts out of the market for an indefinite period. Washington acknowledged that the process took a long time, notwithstanding the regulation's directive that it be conducted quickly. When asked if any contracts committed to the SBA for § 8(a) consideration had ever been given back to the awarding government agency for any reason, Washington responded that he knew of no committed contract ever having been withdrawn because of adverse impact on competing non-eligible contractors in a particular market area.

Washington discussed impact studies as they were being conducted at the time the eleven contracts in question were committed. He stated that impact studies were generally not conducted in regard to construction contracts because they were not of a "recurring" nature. This meant that a project would be undertaken and completed within a particular time frame, and that it did not recur as a new project in a subsequent fiscal year. Nevertheless, according to Washington, an impact study was conducted with regard to the eleven contracts in question. He pointed to the exhibits P–140 and P–141, forms which provided for the accumulation of relevant information, such as whether there was a suitable § 8(a) contractor, whether another § 8(a) contractor was already doing the same work in the area in question, whether the project was manageable, and whether allocation to 8(a) would take too much away from the private sector.

The impact rationale sections of the forms are blank. Washington made no claim that the study conducted was anything other than a cursory analysis made by an employee far away from the affected market. He acknowledged that no specific study of the Vicksburg area had been conducted to determine the effect of a 100%

---

**11.** Washington explained that he worked in Region IV which was composed of eight states and included the Vicksburg, Mississippi area.

set-aside. There was nothing to show that any outreach program had been established in the Vicksburg area to identify and inform § 8(a) eligible contractors.

The plaintiffs also assert that SBA continued to certify certain contractors of questionable eligibility for the § 8(a) program. They refer specifically to Polote Home Builders, Inc., a Georgia Corporation which is said to have remained eligible for 8(a) longer than any other firm. Polote was awarded 38 contracts under the § 8(a) program over a period of years. According to the SBA Form 1017 which is marked as exhibit P–42, Polote's business plan called for 6,000,000.00 of § 8(a) support in 1980 and another $3,000,000.00 in 1981. Polote was awarded a total of $12,000,000.00 in § 8(a) supported contracts in 1980 and 1981, notwithstanding that the business plan called for only $9,000,000.00 in support. After SBA had accepted $9,000,-000.00 in § 8(a) contracts on Polote's behalf, Polote was still considered for one of the eleven Vicksburg contracts. The plaintiffs argue that Polote had already been subsidized to the extent of its business plan, yet it was still given preferential consideration on at least one of the eleven contracts in question while the plaintiffs were precluded from bidding. Meanwhile, new § 8(a) eligible contractors were not being identified and developed. The Corps and the SBA were anxious to make a good § 8(a) showing, so the procedure was short circuited in favor of § 8(a) eligible contractors such as Polote whose performance was proven. Graduation from the program was postponed so that a reliable § 8(a) contractor would be available. The plaintiffs point to the comments of Isaiah Washington himself in a 1983 document shown to Washington on cross examination. Washington acknowledged that termination of Polote from the program would adversely impact upon the SBA's ability to meet Administration and agency minority procurement goals. According to Washington, there were only two § 8(a) qualified contractors in his entire region who were capable of performing large § 8(a) contracts.

The plaintiffs then attack the economically and socially disadvantaged status of the Polote company, representing the net worth of Mr. and Mrs. Polote to be $2.3 million dollars. The Polotes were said to have used some of their § 8(a) funds to start a leasing business for Mrs. Polote. This business is said to have had a net worth of $300,000.00 in 1983. The plaintiffs then infer that Polote has used its preferred position to offer bids much higher than the reasonable cost of the jobs undertaken. This inference is based upon the award of two jobs to the plaintiff, Four F Corporation, on bids of $1,000,000.00 and $900,000.00 respectively. Polote is said to have presented respective bids of $4.2 million and $3.0 million on these same two jobs.

Another circumstance presented by the plaintiffs concerns the eligibility status of A.L. Rowan and Sons. This company qualified at one time under the § 8(a) program. At the time in question, Rowan had submitted documentation in support of continuing eligibility. While SBA approval was still pending on this matter, the SBA accepted approximately $3,000,000.00 in contracts on Rowan's behalf. One of these contracts was one of the eleven in question which involved building a boat launching ramp in Sharkey County, Mississippi.[12] The project was valued between $25,000.00 and $100,000.00. Rowan offered a bid of $200,000.00 and the project was withdrawn. Rowan was later found to be uncertifiable for § 8(a) eligibility.

C.L. Fairley Construction Company, Inc. is a Kansas Corporation whose § 8(a) support level began with $150,000.00 in 1976. This support level dropped to $25,000.00 in 1979, but was raised to $1,000,000.00 by the end of 1979. Contracts accepted by the SBA on Fairley's behalf totaled $1,800,-000.00, almost double the suddenly increased business plan support amount of 1979. C.L. Fairley's net worth is said to have increased from $300,000.00 in 1979 to $1.6 Million in 1981. SBA still retained C.L. Fairley as an eligible § 8(a) contractor and raised its business support plan to

---

**12.** See project # 2 on exhibit P–155.

$2,000,000.00. A total of $5,000,000.00 in § 8(a) contracts was offered to C.L. Fairley in 1981. Two of these contracts appear on the list of the eleven in question and together were valued between $1.5 and $6.0 million dollars.[13]

Other circumstances cited by the plaintiffs include the oversubsidy of Encon, Inc., another § 8(a) contractor considered for an award of one of the projects in question. Mycon Construction, Inc., is said to have received contract opportunities even though it had no supporting business plan. The J.P. Dickerson Company was offered over $3,000,000.00 in contracts despite a support level of only $100,000.00. The plaintiffs assert that the SBA, in its zeal to show § 8(a) activity, was almost enticed to award a $550,000.00 contract to Caspan Corporation, a company acting in collusion with a non-eligible contractor in order to obtain subsidy. There is also the matter of the Chata Septic Tank Company which held itself out to be an American Indian entity. It had a net worth of $770,000.00 at the time it was first subsidized, a fact which the plaintiffs contend should have excluded Chata from the § 8(a) program as non-disadvantaged. Chata was operated by a white superintendent and subcontracted over two-thirds of its projects to non-minority subcontractors. Chata's business plan called for a total of $100,000.00 in § 8(a) support for 1981, but it received a $3,000,-000.00 contract.

Based upon the foregoing, the plaintiffs contend that SBA was haphazardly carrying out its statutory mandate in an effort to make a good § 8(a) showing. They reassert that at no time was an impact study in accordance with 32 C.F.R. § 1–705.5 conducted, so SBA had nothing upon which to rely in order to justify the 100% set-aside. Plaintiffs allege that the SBA's own impact analysis was either cursory or conducted only after contract awards were made.

In those cases where no evidence of an impact study was available, Isaiah Washington stated that the documentation had been lost or destroyed. Moreover, even if the impact studies on every relevant contract had been available, the testimony of Isaiah Washington established that nationwide studies were conducted to determine impact. But, this study base would have had little relevance to the impact of a 100% set-aside of contracts available upon the Vicksburg, Mississippi, market. No outreach program was conducted to identify and inform eligible § 8(a) contractors. No attempt was made to award § 8(a) contracts within the Vicksburg market, or even within the State of Mississippi. Moreover, the plaintiffs assert that SBA knew who the plaintiffs were in 1981, and that SBA already knew the nature of the local market from having dealt with local contractors such as the plaintiffs in the past. Much of the information which could have been used in a local impact study was already known by or available to the SBA. Notwithstanding this, SBA participated in the Corps' 100% set-aside without taking into consideration the fact that Vicksburg area contracts had historically been let through small business set-asides, and that no study of the local Vicksburg market had been conducted to determine if there existed any § 8(a) eligible contractors. SBA went instead to a list of sometimes dubiously qualified contractors in order to rapidly show results in the § 8(a) program. SBA proceeded without regard for its statutory directive to maximize participation in government contracting by both non-§ 8(a) eligible small-business concerns, and those small-business concerns owned and controlled by disadvantaged contractors. 15 U.S.C. § 637(d)(1).

## RESPONSE OF THE CORPS AND THE SBA

The Corps and other Army defendants have made no response to the plaintiffs' allegations other than through the testimony of those witnesses who said they thought they were doing the right thing at the time. Since this matter was tried, the plaintiffs have informed the court that they would not object to a finding that the SBA alone, and not the Corps, was responsible for the failure to conduct impact studies.

---

**13.** See projects # 9 and # 10 listed on exhibit P–155.

However, the regulation states that the department within the Army receiving the SBA's request for contract commitment shall evaluate the business plan offered by SBA, giving consideration to the seven factors set forth in Section 1–705.5(c)(1)(B) of the regulation. One of the factors to be considered is the impact of a minority business set-aside where items were acquired historically by small business or labor surplus area set-aside. This responsibility certainly falls upon the Corps to shoulder, especially where the set-aside was to consist of every available contract in a market area for a given fiscal year.

The SBA responds that the plaintiffs' expectations with regard to 32 C.F.R. § 1–705.5 are unrealistic and that plaintiffs seek to make the statute governing SBA § 8(a) participation, 15 U.S.C. § 637(a)(1)(C), subservient to this regulation. SBA asserts that it would not be able to conduct impact studies of specific markets such as the Vicksburg area on a nationwide basis, however, SBA has shown no other market area in the nation where 100% of the contracts set-aside for small-business concerns were relegated to the § 8(a) program.

SBA next contends that the Corps referred contracts to it for § 8(a) consideration knowing that not all of the projects would be accepted. Additionally, SBA relies upon the number of § 8(a) contracts let for 1979 and 1980 in the Vicksburg area being less than five percent of all available small business set-asides to justify the 100% offering in 1981.[14] SBA then argues that even if the 100% set-aside was improper, no harm was done since only two of the eleven available contracts were undertaken by § 8(a) eligible contractors in the final analysis. This argument ignores the fact that the plaintiffs took action to enjoin the 100% set aside in 1981. There is nothing in the record to show that all eleven of the contracts in question would not have been accepted by SBA and offered to the list of regularly relied upon contractors if the plaintiffs' lawsuit had not been filed. From the Corps actions subsequent to the plaintiffs' lawsuit, it is apparent that a proper set-aside could have been implemented from the beginning of the 1981 fiscal year.

SBA has repeatedly argued that its role in this matter is that of an intermediary between federal agencies and eligible contractors, and that this role has been carried out in a lawful manner. SBA contends that any assertion by the plaintiffs of unlawfulness is based upon nothing more than plaintiffs' misperception of what is actually required by the applicable law and regulations. The plaintiffs have argued that impact studies were required. SBA responds that this is not statutorily required of SBA, but instead, that its policy was to conduct thorough impact studies only for what it regarded to be "recurring" projects. Construction contracts did not, according to the testimony of Isaiah Washington, fall into the category of recurring projects because, once finished, they were complete. What SBA apparently seeks to obfuscate by this argument are its own statutory directives to initiate outreach programs, to seek to award contracts to eligible businesses within the area, or at least within the state, and to maximize participation by both disadvantaged and non-disadvantaged small-business concerns. These directives are set forth in § 637(a) and (d) and are not being made subservient to any of the Corps' regulatory directives by this opinion.

On the matter of determining program eligibility, SBA reminds the court that as an agency of the federal government it is entitled to great deference with regard to the manner in which it carries out the intent of Congress. The plaintiffs' complaint is characterized as a facial attack on the requirements of § 8(a) and the manner in which the SBA goes about developing economically competitive small-businesses. SBA charges that the plaintiffs seek the destruction of the § 8(a) program. This assertion could be persuasive if the set-aside in question had been minimal or moderate. However, the court is faced with a 100% set-aside, and the plaintiffs' effort to

14. See government exhibits 2 and 3.

keep this kind of extreme action from being repeated. To declare such a set-aside improper under the applicable statutes and regulations in no way threatens the existence of the § 8(a) program. In addition, plaintiffs expressly disavow any constitutional attack upon the § 8(a) program.

SBA then responds to the plaintiffs' assertions with regard to some of the § 8(a) program eligible contractors. Polote Home Builders, Inc. is said to be an example of a program success story. SBA admits that Chata Septic Tank Company, Inc., was operated by a non-minority superintendent, but counters with the assertion that the business entity was at least controlled by American Indian interests.

SBA admits that it sometimes exceeded the support levels planned for eligible minority enterprises, notwithstanding that SBA's standard operating procedures state that support levels will not be exceeded by more than 125% in any given year. The standard operating procedures are said not to be binding on SBA's activities. For instance, SBA claims that it can simply change the support plan figure at any time, then not exceed that new figure by more than 125%. While this court realizes that practicalities must be taken into consideration, there is still no sufficient explanation given by SBA for exceeding some business plans from ten to thirty times the original support figure established by a participant's plan.

Finally, SBA admits that it was often behind in its paperwork because it could not keep up with the dynamics of its operation, and that this sometimes led to irregularities such as those complained of by the plaintiffs. While this court is sympathetic to the formidable task faced by many government agencies, this still does not explain away the set-aside of 100% of the small-business contracts without further study or concern. This set-aside was highly unusual. It did not occur nationwide. That it was so atypical should have invoked a responsible reaction in accordance with statutory and regulatory directives, and not simply acceptance blinded by zeal or pressure.

## APPLICABLE LAW

The plaintiffs' claim is based upon 42 U.S.C. § 2000d which bars racial discrimination in government contracting. Plaintiffs also charge discrimination pursuant to 42 U.S.C. § 1981. Further, plaintiffs allege violations of their due process and equal protection rights under the Fifth Amendment. The plaintiffs rely upon the statutes which provide for review of arbitrary agency action by this court, 5 U.S.C. §§ 702, 703 and seek declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 in the form of an opinion by this court that the actions of the defendants were arbitrary, capricious, or otherwise improper. The plaintiffs recognize that while this court may issue an order designed to prevent repetition of any found violations, the court may not impose an injunction against the SBA since this would be contrary to the Small Business Act. 15 U.S.C. § 634(b)(1).

The plaintiffs rely upon *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), a case which addresses the § 8(a) program as well as the Public Works Employment Act which provides that 10% of any and all federal funds granted under this Act must be used to procure minority services. *Fullilove* holds that this 10% requirement is not unconstitutional so long as it is not arbitrary and is subject to waiver. The case also holds that these types of affirmative action plans must be supported by a compelling governmental interest to remedy historical impairment of opportunities to enter into government contracting, and narrowly tailored to correct the effects of past discrimination. *Fullilove v. Klutznick, supra,* 100 S.Ct. at pages 2775, 2778.

The plaintiffs argue that the 100% set-aside in the case *sub judice* was neither compelled by a valid governmental interest, nor narrowly tailored. There was no attempt to determine the extent of past discrimination so that a foundation for remedial action could have been formulated. No outreach was conducted to identify eligible contractors in the area or the state. Plaintiffs argue that the only governmental in-

terest being served was that of the Corps and its desire to greatly improve its § 8(a) program participation. According to plaintiffs, discrimination was simply presumed, and the remedial plan was to disenfranchise all non-minority, non-disadvantaged small-business contractors. Hence, say the plaintiffs, the actions of the Corps and the SBA were improper. That, in a nutshell, is the plaintiffs' case.

*Fullilove* is a narrow opinion. It turns the way it did because the collective opinions of three judges placed great emphasis upon the unique legislative power of Congress to correct social wrongs found by congressional investigations to require legislative action. Three other judges agreed with this in principle. This principle is the cohesive element in the opinion. Section 5 of the Fourteenth Amendment gives Congress this power. Therefore, the duty of the court was to determine whether the exercise of this power itself violated any constitutional rights. The opinion makes clear that Congress may employ racial or ethnic classifications in exercising its spending or other legislative powers only if those classifications do not violate the equal protection component of the Due Process clause of the Fifth Amendment. *Fullilove v. Klutznick, supra,* 100 S.Ct. at pages 2775, 2776.

The U.S. Supreme Court took a close look at the waiver provision of the legislation in question. Congress had determined that a public works program would boost the economy. It was also concerned that minority business enterprises participate in these works. There was a provision that ten percent of all monies let to contractors would go for the hiring of minority contractors and vendors. Hence, a contractor winning the bid for a particular project was required to show that 10% of the work subcontracted went to minority business enterprises. Where compliance was not possible or practical, the set-aside could be waived by the government administrator in charge of the particular project. This provision, more than any other aspect of the legislation, assured its survival of constitutional scrutiny.

The plaintiffs in *Fullilove* were various contracting associations, not eligible for the 10% procurement under the applicable legislation, who tried to show that an unconstitutional burden had been placed upon them. The federal district court denied the requested injunction. The Circuit Court of Appeals affirmed, expressly rejecting the plaintiffs' claim that the 10% set-aside violated equal protection under the Fifth Amendment. The U.S. Supreme Court called the plaintiffs' burden "relatively light." Where the burden might become infeasible, the discretion of the federal administrator could remove the "burden." Only the dissenting Supreme Court justices believed that any racial or ethnic classification was improper, regardless of the circumstances.

The burden shouldered by the *Fullilove* plaintiffs was indeed light by comparison to that of the plaintiffs in the case *sub judice.* Where the *Fullilove* plaintiffs could almost continue with business as usual, but for the 10% set-aside, the plaintiffs in Vicksburg were precluded from any participation whatsoever. The 100% set-aside was restricted to 8(a) contractors only. The plaintiffs complain that this was neither narrowly tailored to correct past wrongs nor responsive to any compelling governmental interest. *Fullilove* involved only a 10% set-aside, not a 100% set-aside. There was no opportunity to waive the 100% set-aside. The plaintiffs did not get a chance to bid on anything until after injunctive relief was granted.

*Fullilove* approved an Act of Congress, an action imbued with the unique legislative power granted only to Congress. The case did not deal with the peculiarities of a particular application of the law. This would have to await future cases dealing with the questions of overinclusiveness and/or denial of waiver. However, the Supreme Court did say that overinclusiveness could not be overlooked even with regard to the Act of Congress in question. Congress found present effects of past discrimination through its investigations, determined that the 10% set-aside would help eliminate present effects of past discrimination, and added a very significant waiver

and exemption provision. The narrowing features of the legislation itself were found sufficient to overcome any assertion of overinclusiveness, but this did not mean that future application of the set-aside principle could not be challenged on overinclusiveness grounds.

If overinclusiveness was entitled to nominal consideration in *Fullilove,* the plaintiffs contend that it should be a matter nothing short of paramount interest to the court in this case. The plaintiffs argue that the 100% set-aside was the product of pressure, attempts to please supervisors, and negligent application of the law. There was no compelling governmental interest, and no attempt was made to justify the 100% set-aside on the basis of present effects of past discrimination, current discrimination, or any other form of discrimination in the Vicksburg market. That SBA determined there to be no adverse effect on non-minority contractors was a conclusion based on an analysis of the figures in nationwide proportion. Hence, the conclusion bore no relation to the Vicksburg market. The plaintiffs contend that this is a case of overinclusiveness, and that the actions of the defendants were clearly improper.

In the case of *City of Richmond v. Croson,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), the Supreme Court struck down a 30% set-aside program adopted by the city council. Justice O'Connor described the case as another confrontation of the tension between the Fourteenth Amendment guarantee of equal treatment and the use of racially based measures to ameliorate the effects of past discrimination.

The ordinance in question was based upon a study conducted by the City of Richmond and a finding that contract awards did not reflect the city's general population mix. Half the citizens were black, but only 0.67% of the city's contracts had gone to minority businesses between 1978 and 1983. The term minority was very broad, including all the ethnic groups listed in the federal legislation in question in *Fullilove,* as well as Eskimos and Aeluts. However, no direct evidence of race discrimination on the part of the city in letting contracts was shown by the study, nor was any evidence presented to show discrimination by the city's prime contractors in subcontracting to minority businesses.

After the measure was passed, a nonminority contractor won a bid and tried to comply with the 30% set-aside, however, there was no way the 30% set-aside could be met because the limited availability of minority contractors. The city refused to consider anything less than a 30% set-aside, called back the contract, and reopened it for bidding. The contractor sued.

The federal district court upheld the plan in all respects according to the principles set forth in *Fullilove.* The Fourth Circuit affirmed. The majority of that court found that national findings of discrimination in the construction industry, when considered with the statistical study concerning the award of prime contracts in Richmond, made the city's 30% set-aside a reasonable requirement.

The Supreme Court granted certiorari, then vacated and remanded the Circuit Court's decision for further consideration in accordance with the decision in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), a case with a complicated history which held that a state's means to effectuate an affirmative action plan must be narrowly tailored to the achievement of that goal. *Id.,* 106 S.Ct. at page 1846.

*Wygant* involved the question of whether a school board, consistent with equal protection, may extend preferential protection against layoff to some of its employees because of their race or national origin. The teacher's union negotiated with the school board to give this preference to more recently hired black teachers in the event of any layoff so as to help ease the effects of past discrimination. When layoff subsequently became necessary, the board decided this agreement violated state law regarding tenured teachers. Therefore, while retaining as many minority teachers as it could, the school board also retained tenured white teachers while lay-

ing off minority teachers who were still on probationary status. The result was that the agreed percentages were not maintained. The union and the probationary teachers sued.

The federal district court concluded *sua sponte* that it had no jurisdiction over the matter because it had not been adequately shown that the school board had engaged in any discriminatory hiring practices prior to 1972 as was claimed, and because the case had not first proceeded through EEOC channels as Title VII cases were then required to do. Without appealing, the plaintiffs filed a state court action and won. The state court found that the school board's action constituted a breach of contract. The state court further held that no violation of the tenured teacher statute would occur by adhering to the contract.

The school system's white tenured teachers then went to federal district court asserting violation of their constitutional rights under Title VII and 42 U.S.C. § 1983. The district court this time found that the racial preferences granted by the board need not be grounded on any finding of prior discrimination. Instead, racial preferences were permissible as a remedy to past general societal discrimination by providing minority students with minority teacher "role models." The Sixth Circuit affirmed this finding.

The Supreme Court reversed, holding that racial and ethnic distinctions are inherently suspect and call for exacting judicial examination. The Circuit Court rationale, if upheld, would logically lead to the conclusion that only black teachers could provide proper role models for black students. Relying on its decision in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the Court clarified that it had never held societal discrimination alone to be a sufficient justification for a racial classification. The court insisted upon a showing of prior discrimination by the government unit involved before allowing limited use of racial classifications or other affirmative action to remedy such discrimination. The *Wygant* court concluded that a public employer should insure that it has convincing evidence of the need for remedial action before embarking upon affirmative action programs.

The *Hazelwood* case cited in *Wygant* provides an example of practically assessing the method of showing past discrimination, and narrowly tailoring the focus of that showing. The plaintiffs used the racial composition of the entire work force in the area to justify claims against the school board. The Supreme Court found that a comparison of the teacher market with the available minority teachers in that market would have been a more focused and valid comparison. In other words, the Court determined that discrimination in general over a wide variety of professions was not a sufficient data base upon which to justify the particular claims of discrimination involved.

The foregoing authorities show that the process of remedying past discrimination must not be one which is broadly applied based upon presumptions of discrimination. Naturally, the burden of remedying past discrimination must be borne by someone. And, as the Supreme Court has pointed out, upon the promulgation of a limited and properly tailored remedy to cure the effects of prior discrimination, a sharing of this burden by innocent parties is permissible. *Fullilove v. Klutznick, supra*, 100 S.Ct. at page 2778. There was certainly nothing wrong with setting aside some of the eleven contracts in question for § 8(a) program consideration. The ideal goal in this type situation is to provide a suitable remedy to those minority and disadvantaged small-businesses who have suffered from past discrimination, but at the least expense possible to the non-minority and non-disadvantaged contractors who qualified for small-business set-asides. *See, Williams v. City of New Orleans*, 729 F.2d 1554, 1564 (5th Cir.1984). A 100% set-aside fell far short of attaining this end.

## CONCLUSION

The court finds from the evidence and the authority presented that relegating all of the small-business set-aside contracts to

be let by the Army Corps of Engineers, Vicksburg District, in fiscal year 1981 to the Small Business Administration for exclusive § 8(a) program consideration was overinclusive and did not effectuate a limited and properly tailored plan to remedy past discrimination. The court further finds that the United States Army Corps of Engineers failed to give consideration to the impact of a 100% set-aside upon non-§ 8(a) eligible contractors in the Vicksburg area in accordance with its regulatory directive found at 32 C.F.R. § 1–705.-5(c)(1)(B)(vi).

The court further finds that by participating in the furtherance of the 100% set-aside, the Small Business Administration ignored its statutorily directed policy pursuant to 15 U.S.C. § 637(d)(1) to provide the maximum practicable opportunity to both small-business concerns, and small-business concerns owned and controlled by socially and economically disadvantaged individuals, to participate in the performance of contracts let by the Army Corps of Engineers.

As a result of these aforesaid failures of the defendants, the plaintiffs, Fordice Construction Company and Four F Corporation were impermissibly excluded from participation in the federally financed activity of protected procurement for small-business concerns in violation of 42 U.S.C. § 2000d. The court finds that the aforesaid plaintiffs are entitled to declaratory relief in accordance with 28 U.S.C. § 2201. The court hereby declares that the 100% set-aside of all available small-business contracts for exclusive § 8(a) consideration engaged in by the Army Corps of Engineers, Vicksburg District, and the Small Business Administration was an improper exercise of these defendants' statutory and regulatory authority, resulting in discrimination against the plaintiffs prohibited by 42 U.S.C. § 2000d.

SO ORDERED AND ADJUDGED.